## J. C. McNaughton Co. *v.* Haldeman, Appellant.

[Marked to be reported.]

*Wagering contract—Stock gambling—Margins.*

Where the profits of stock transactions are paid over by the broker to his customer, but the amount of the original margin is left in the hands of the broker, the customer may recover the margin in an action against the broker.

*Promissory notes—Settlement of stock transactions—Evidence.*

In an action by an indorsee against the indorser of a promissory note, the deposition of the maker of the note, a broker, is inadmissible, which admits that the maker received margins from the payee, but does not aver that he ever repaid them, or that the note was given exclusively for profits.

Argued Feb. 8, 1894.   Appeal, No. 3, Jan. T., 1894, by defendant, Thomas J. Haldeman, from judgment of C. P. Delaware Co., June T., 1890, No. 81, on verdict for plaintiff, J. C. McNaughton Co.   Before Sterrett, C. J., Green, Mitchell, Dean and Fell, JJ.   Affirmed.

Assumpsit on promissory note by indorsee against indorser.

At the trial, before Clayton, P. J., it appeared that I. L. Haldeman was a stock broker, and J. C. McNaughton was one of his customers.   In settlement of certain transactions between them, the note in suit was given by Haldeman to McNaughton. Before the note was given to McNaughton, it was indorsed by T. J. Haldeman.   After the payee received it, he wrote his own name over that of T. J. Haldeman, and the name of the company of which he was president and treasurer under the name of T. J. Haldeman.   The note with its indorsements was as follows:

"Phila., Dec. 6, 1889.

"Four months after date I promise to pay to the order of J. C. McNaughton, six hundred and forty-three dollars, at 807 Green St., Phila., without defalcation for value received.

(Signed,) "I. L. Haldeman."

Endorsed as follows in the following order: "J. C. McNaughton, T. J. Haldeman, J. C. McNaughton Co., J. C. McNaughton, Treas."

It appeared that the note in suit was a renewal of another note for a like amount.

Under objection and exception, the court refused to admit in evidence the deposition of I. L. Haldeman, which was as follows:

"When I delivered the note to him, T. J. Haldeman was the only name on the back. Mr. Haldeman did not receive any consideration or value from any person that I know. To my knowledge he did not have any interest in or receive any value or derive any benefit from the note in any manner. He was never the holder or the owner of the note. I had the note myself and I delivered it to Mr. McNaughton. To my knowledge he was never indebted to Mr. McNaughton in any manner, or to any person through this note. Q. Can you tell us how this note originated? A. It was to settle a balance in a stock transaction between J. C. McNaughton and myself. That balance was made up of profit and losses in those transactions. Mr. McNaughton came into my office an entire stranger to me, about four or five years ago; he wanted to deal in stock. I was a stock broker. He proposed to deal on margin, making his margin as small as possible, never more than one per cent. That was not a purchase of stock. (That is a sort of gambling in stock.) With the money he furnished me, I did not actually purchase any stock. With that kind of a margin, stocks were never actually purchased by brokers. A person who wants to buy stock through a broker has to put up a margin of from ten to fifteen per cent. McNaughton never asked me to buy stock for him. I never bought or held any stock for Mr. McNaughton. He never demanded any stock from me.

"Mr. Broomall, for plaintiff, objects to all this testimony as irrelevant.

"I did not make a failure. A firm that I dealt with in New York failed, and could not make good their margins which I had put up with them.

"All the margins which I got from Mr. McNaughton went to the New York firms which I dealt with. Mr. McNaughton had been dealing in marginal stock transactions long before he dealt with me, and he dealt with me four or five years. He was what I call dealing in liberal quantity with stocks. In my talk with him I knew that he understood marginal trans-

actions. During the four or five years he dealt with me he never got any stock from me, nor asked for any. If he had asked for any in his transactions with me, he would have had to leave money with me to purchase them. He never had stock enough with me with sufficient margin at any time to purchase any one kind of stock. His margin was scattered amongst different kinds of stock; sometimes ten or twelve different kinds of stock.

" In these marginal transactions there was no stock purchased,. but if the stock went down that he had his margin on, and he wanted to hold on to his chances of making a profit out of it, he had to put up an additional customary margin which was generally one per cent, but if the market value of the stock that he was keeping his margin good on, went up in value, then he was entitled to the difference. That was the process under which Mr. McNaughton and myself came to that settlement under which the note was given. I had had a number of settlements with him during our business transactions, and that is the way it was always done. I kept an account of the stock Mr. McNaughton was dealing in as to the rise and fall in them. This I got from the reports in the stock market, and no stock was ever bought or sold.

" The note in suit was not accepted by Mr. McNaughton for four or five weeks after the former note became due.

" He refused to accept the note unless part of the former note was paid. I never agreed to buy stock for Mr. McNaughton and he never asked me to. I paid Mr. McNaughton all the money I ever borrowed of him, and at the time the note was given I did not owe him a cent for borrowed money. I never did send Mr. McNaughton notice that I had bought stock for him, and never did send to him for money to pay for stock that I had bought for him." [3]

The court, under objection and exception, admitted the following letter from defendant to plaintiff's attorney, offered for the purpose of showing that defendant was " endorser and requested liability : "

" I. L. Haldeman has a new note with my indorsement to take this one up. He has McNaughton's promise that he will give him one more year's time to pay it, and the time is not up until this new note comes due. I do not understand that he

makes the demand at this time.    I. L. Haldeman will renew the note and pay the discount." [1]

The court below said in the presence of the jury: " [Unless the company knew of the irregularity of the indorsement, it being regular upon its face, Mr. Haldeman must pay the note.] " [2]

Binding instructions for plaintiff were given. [4]

*Errors assigned* were (1–4) rulings on evidence and instructions; quoting instructions and evidence but not bills of exceptions.

*George E. Darlington* and *E. H. Hall*, for appellant.—Where a person indorses a note before the payee, he assumes the position of second indorser: Shafer v. Bank, 54 Pa. 144; Murray v. McKee, 60 Pa. 35.

If this note is subject to the defence that it is void, if the jury shall find that it was given in consideration of a settlement of difference in a gambling transaction in stock, the position of second indorser is jeopardized, as the first indorser, who is the payee and knows all about the transaction, might set up this defence, as against a recovery by the defendant here, against him.

The exclusion of the deposition of the maker of the note was error: Comly v. Hillegass, 94 Pa. 138; Harper v. Young, 112 Pa. 419; Brua's Ap., 55 Pa. 294; Fareira v. Gabell, 89 Pa. 89; Gaw v. Bennett, 153 Pa. 247.

*W. C. Wilson*, for appellee.—When a person puts his name on the back of a negotiable paper before the payee has indorsed it, he means to pledge in some shape his responsibility for the payment of it, and in the absence of legal evidence he assumes the position of second indorser: Shafer v. Bank, 59 Pa. 144; Eilbert v. Finkbeiner, 68 Pa. 243; Dreydoppel v. Bank, 134 Pa. 499.

And prior to Jan. 1, 1856, when the statute of frauds went into effect, it could have been shown by parol evidence that the intention of the regular indorser was to guarantee the payment of the note to the payee: Leech v. Hill, 4 Watts, 448; Taylor v. McCune, 11 Pa. 460; Eilbert v. Finkbeiner, 68 Pa. 243.

Speculation is not gambling, and simply because a man buys when low and sells after an appreciation, it is not gambling. In the cases in Pennsylvania, there has always been testimony as to the real character of the transaction.

It has never been sought to prove the illegality of the contract simply by showing there had been purchases and sales of stock by the broker on behalf of the customer, or that a broker, when sued to recover the balance due, deposited as margin, could set up the defence that he never intended to buy or deliver stock, and that it was a gambling transaction, because he, the broker, was gambling: Brua's Ap., 55 Pa. 294; Fareira v. Gabell, 89 Pa. 89; Ruchizky v. DeHaven, 97 Pa. 202.

It does not appear whether the money was for margins deposited or whether it was for losses by the broker. If it was for margins, McNaughton could certainly recover: Peters v. Grim, 149 Pa. 163.

If the note was given for margins it does not necessarily follow that it was a gambling transaction, even if the stock was bought for speculation. Such transactions are perfectly legitimate. In order to convert such transactions into wagers the parties must agree that no actual stock shall be sold and delivered: Repplier v. Jacobs, 149 Pa. 167; Fareira v. Gabell, 89 Pa. 89.

The corporation was dealing with its sometime agent in this particular transaction as with a stranger, and in such case it cannot be presumed that the agent communicated his knowledge to his principal, when to do so would defeat his purpose. This distinction does not appear to have been drawn in any Pennsylvania case, but it is consonant with reason and principle, and has been held in a large number of American and English cases and stated by text writers. See Innerarity v. Merchants' Bank, 139 Mass. 332.

In Wilson v. Bank, 7 Atl. R. 145, an affidavit of defence, setting up that the cashier of a bank was an officer of the corporation procuring the discount of the note, and that the corporation had failed to give consideration for the note, was held to be insufficient.

OPINION BY MR. JUSTICE GREEN, March 5, 1894:

It is impossible to tell from the deposition of I. L. Haldeman

what the exact consideration of the note in suit was.   He says, " It was to settle a balance in a stock transaction between J. C. McNaughton and myself.   That balance was made up of profit and losses in those transactions."   He further said that he never bought any stock for McNaughton and of course he never sold any.   He however received money from McNaughton by way of margins and he had a number of settlements with him during their transactions.   Of course there was money due from I. L. Haldeman to McNaughton, and for that money the note in suit was given.   It was made payable to J. C. McNaughton and was indorsed by T. J. Haldeman, the defendant, at the time of its delivery.   McNaughton indorsed it over the name of T. J. Haldeman, as he had a perfect right to do, and then passed it to the plaintiff company.   This action is by the indorsee against the indorser, and there is no testimony in the case impeaching the title or the good faith of the plaintiff in acquiring the note. Whether the money for which the note was given represented the margins which J. C. McNaughton had deposited with I. L. Haldeman, or whether it represented profits on the transactions, or part margins and part profits, the testimony utterly fails to tell and of course we do not, and cannot, know.   It certainly does not represent the proceeds of any stocks sold because none ever were sold.   We cannot say that it does not represent the money deposited by way of margins, and we are not at liberty to presume an illegal consideration in the absence of testimony to establish it.   The witness says he paid McNaughton all the money he ever borrowed of him, but he does not say that he ever paid him any of the money he received as margins.   We decided in Peters v. Grim., 149 Pa. 163, that where the profits of stock transactions were paid over by the broker to his customer, leaving the amount of the original deposit in the hands of the broker, the customer could recover this money in an action against the broker.   And so here, the broker admits that he received margins from his customer, and does not say that he ever repaid them.   He does not say that the note was given exclusively for profits and we cannot assume that it was.   The action is on negotiable commercial paper in the hands of an indorsee whose title is not impeached, and it is against an indorser who had nothing to do with the transactions out of which it arose.   Upon every principle the legal presumption is in favor

of the validity of the note, and we think the learned court below was entirely right in excluding the deposition of I..L. Haldeman and in directing a verdict for the plaintiff. The assignments of error are all dismissed.

Judgment affirmed.