CLARENCE A. PLANK, Appellant, v. DICK SWIFT, Appellee.

BILLS AND NOTES: Validity—Bona-Fide Holder. Where the title
1    of one to whom checks were delivered, and by him negotiated, was defective, within Sec. 3060-a55, Code Supp., 1913, the burden is on the transferee to show he is a good-faith holder; and if the fair tendency of the facts indicates bad faith of the holder, the question is one, not of law for the court, but of fact for the jury. Evidence reviewed, and held insufficient to show, as a matter of law, that transferee was such a holder.

BILLS AND NOTES: Validity—Checks Given for Gambling Debts.
2    Under Sec. 4965, Code, 1897, checks given for a gambling debt  .

are void, even in the hands of an innocent holder, and that section has not been repealed or modified by the Negotiable Instruments Law.

*Appeal from Sioux District Court.*—C. C. BRADLEY, Judge.

OCTOBER 14, 1919.

ACTION at law to recover the amount of certain bank checks, drawn by the defendant, payable to the order of John Wilson. Judgment for the defendant, and plaintiff appeals.—*Affirmed.*

*Van Oosterhout & Kolyn,* for appellant.

*C. E. Gantt,* for appellee.

WEAVER, J.—The checks sued upon are two in number, one for $150, and another for $250, both drawn by the defendant, Dick Swift, upon the First National Bank of Hawarden, and made payable to the order of John Wilson, a name which appears to be endorsed thereon. Plaintiff, claiming to be a good-faith holder for value, alleges that the checks have been dishonored, and asks judgment against the maker.

The defendant admits making the checks and delivering them to one Edwards, who negotiated them to plaintiff, and pleads in defense that they were made and delivered in payment of a gambling debt, contracted in a game of craps with said Edwards. The issues were tried to the court, a jury being waived. Judgment for defendant.

The plaintiff is a practising lawyer of experience, residing at Hawarden. Living in the same town is the defendant, Swift, a retired farmer, of convivial habits, socially inclined, and (until his experience hereinafter referred to) profoundly confident of his ability to beat a professional gambler at his own game. Edwards is a travel-

ing fakir, who follows up county fairs and other public assemblies where gather the sheep for his shearing; while "Wilson," if there be any such individual anywhere, is not shown to have any definite location, except in jail in Minnesota, on a charge of murder.

Shortly before the date of these checks, Edwards drifted into Hawarden, and, as was quite natural, soon came into contact with Swift. The powerful attraction of similar tastes led them to seek a convenient room, where they spent most of Sunday night together. Swift is candid enough to say:

"I can't say we were both perfectly sober. I don't think we was too sober, or that we was very drunk."

Edwards furnished the dice, which defendant swears he himself carried away at the close of the game (and, indeed, it seems that the dice were all that was left to him when the game was over), when examination revealed that they were "dirty," "loaded," or "marked," to make the game a sure thing for their owner. Being asked by his counsel to explain or describe the game, he proceeded, with apparent surprise at the professed ignorance of his counsel, to elucidate the mystery and science of it, in the following luminous manner:

"It is what is called a crap game. You play this game with dice. Q. How many? A. Two. Q. You shake these dice from a box? A. No, you have them in your hand, and throw them, that way [indicating]. There is no limit to the number that can play the game. Q. How does the game go,—how is the winner and loser determined? A. You don't understand the game? Q. I don't understand the game at all. That is why I am asking you so particularly. A. Well, it is seven come eleven, when they first come out,— see,—and if you don't make it,—see,—if you make a six, you lose,—see? Q. Well, you take turns about throwing the dice? A. Yes; there is the dice,—see,—and I lose if I

don't get my seven. You have as many throws as you want until you make that seven, if they first come that way. You can bet all the way from 2 cents to $1,000 if you want to. No, we didn't have the money on the table. We just started a game—I had a little silver at first, but not much; but I lost that, and we kept on playing,—see,—and when we got through, I gave him the checks,—see? We were playing for ten and twenty; there wasn't any limit any more. Ten and twenty dollars a throw."

During the night's session, the participants had two reckonings, at the first of which the account was settled by the defendant's check of $150, and at the second, the other check was made and delivered. For reasons perhaps not hard to divine, Edwards took the precaution to have both checks made payable to "Wilson." Swift made his way home on Monday morning, and took early opportunity to go to the bank and stop payment of the paper, being led thereto, apparently, not so much because of his losses, as by indignation at the discovery that Edwards had abused his confidence, by cheating him with "dirty" dice.

The truth of defendant's story as to the origin and consideration of the checks is apparently conceded by the plaintiff; or, to say the least, there is no attempt made to deny or discredit defendant's testimony in this respect.

Edwards, apparently finding Hawarden a fertile field for the exercise of his special talent, remained there through the week, without presenting the checks for payment. On September 26th, he was arrested as a vagrant, indulging in games of chance, and brought before the mayor for hearing. Among the entries in the mayor's docket in that proceeding are the following:

"And now, on this 26th day of Sept., 1915, the defendant being brought into court, he was arraigned; says his right name is C. E. Edwards. Defendant was advised of right to *Council* and time to prepare for trial. Defend-

ant asks that the trial be set for the *folling* day, and refuses bonds.

"And now, on the 27th day of Sept., 1915, at 3 o'clock P. M., the case came on for hearing. *Plaintiff* appears by himself and his Atty., C. A. Plank, and pleads guilty to the charge as set forth in the information. Defendant by himself and his Atty. pleads *bankruptsy* and agrees that the fine and penalty to be assessed shall stand in full force against the defendant should he return to Hawarden. It is therefore ordered that the defendant be released and that he according to agreement leave Hawarden at once and the fine and penalty assessed shall stand remitted so long as he returns not to the city but in full force and effect should he return.

"After hearing the plea of the defendant, the evidence offered and the arguments in the case, the Court finds the defendant guilty upon his own plea entered by his Atty. C. A. Plank; and no sufficient cause to the contrary being shown, it is ordered, adjudged and determined that defendant pay a fine of Twenty-five Dollars, and the costs of this action, taxed at Six Dollars and Thirty-five Cents, or in lieu of the above fine, that he be imprisoned in the County jail for a period of 30 days."

Observing the dates disclosed by the mayor's record, it is interesting to find that plaintiff does not claim to have obtained the checks until September 28th, the morning after the sentence of banishment was imposed upon his client by the mayor.

It is but fair to plaintiff to say that he denies having appeared for Edwards in the mayor's court, on that day; but, on cross-examination, his denial seems to be as to the correctness of the *date*, rather than of the fact of his appearance.

The story of plaintiff's receipt of the checks is too long and too intricate to permit its entire inclusion here;

but it is, in effect, that, on the very afternoon of September 27th, when the mayor's record shows the trial of Edwards to have taken place, a pretended detective from Minnesota appeared in Hawarden, and arrested Edwards on a murder charge, and proposed to hale him across the state line. According to plaintiff, Edwards then appealed for legal aid and advice to plaintiff, who immediately took up the matter, and for the rest of that day and the following day, he wrestled with the case very diligently, and succeeded in so demonstrating the innocence of his client that the invading hosts from Minnesota abandoned the pursuit, and, folding their tents like Arabs, stole away to their native wilds; while Edwards disappeared in the setting sun, or elsewhere, having transferred the two checks to plaintiff as his well-earned fee for professional services.

I. If it were a vital question in the case whether plaintiff can claim any standing as an innocent holder of the paper without notice of any defense thereto, it would be a sufficient answer upon this appeal to say

1. BILLS AND NOTES: validity: bona fide holder.

that, accepting his own story as literally true, our respect for his intelligence would compel a negative answer to this inquiry. It appears beyond reasonable doubt that Edward's title to the checks was defective, in the sense of that term as used in our statute, Section 3060-a55, Code Supplement, 1913, and the burden is thus cast upon plaintiff, in any event, to establish his claim to be a good-faith holder by a preponderance of credible evidence. We have often said that, in such cases, if the fair tendency of the facts indicates bad faith of the holder, the question is one of fact for the jury, and not one of law for the court. It would be little less than ridiculous to hold, under the admitted and well-proved facts in this case, that plaintiff's claim to be a good-faith holder has been established, as a matter of law. *McNight v. Parsons*, 136 Iowa 390; *Keegan v.*

*Rock,* 128 Iowa 39; *City Nat. Bank v. Jordan,* 139 Iowa 499; *O'Conner v. Kleiman,* 143 Iowa 435; *Arnd v. Aylesworth,* 145 Iowa 185.

II. But an insuperable objection to plaintiff's right of recovery is found in the established fact that the checks were given for a gambling debt; and, under our statute, they are absolutely void, even in the hands of a professed innocent holder. Code Section 4965; *Traders Bank v. Alsop,* 64 Iowa 97; *First Nat. Bank v. Carroll,* 80 Iowa 11; *First Nat. Bank v. Oskaloosa Packing Co.,* 66 Iowa 41; *People's Sav. Bank v. Gifford,* 108 Iowa 277.

2. BILLS AND NOTES: validity: checks given for gambling debts.

The case of *Kushner v. Abbott,* 156 Iowa 598, has sometimes been cited as holding that the Negotiable Instruments Law has had the effect to repeal or modify Code Section 4965; and the syllabus or headnote to that case does not reflect the real point decided in the opinion. Though the question as to the effect of the later statute is there mentioned, the court expressly says it is not presented by the record, nor is its decision attempted.

Our attention is called to a case cited from the court of District of Columbia, and possibly others, which tend, in some respects, to uphold the plaintiff's contention; but we are thoroughly persuaded that, in enacting our Negotiable Instruments Law, the legislature did not intend thereby to repeal or modify the statute which places a ban on all gambling contracts, and we are not willing to hold that it has any such destructive effect by implication. The law which throws its shield around commercial paper is too often made to do duty as a city of refuge for unscrupulous persons in the perpetration of frauds and unlawful purposes generally, and courts will hesitate about swinging the door any wider for their shelter, until compelled so to do by explicit legislative command.

III. Plaintiff claims that defendant had estopped

himself to rely on his defense, because of his negligence.

The objection so raised is not well taken. Defendant did stop payment with reasonable promptness, and plaintiff's evidence is insufficient to sustain a finding that he was in any manner deceived or misled to his injury by any act on the part of defendant.

The judgment below is too clearly right to call for further discussion, and it is, therefore,—*Affirmed*.

LADD, C. J., GAYNOR and STEVENS, JJ., concur.