12426

BALTIMORE TRUST CO. v. STANTON

(142 S. E., 716)

1. APPEAL AND ERROR—RESPONDENT CANNOT HAVE ADDITIONAL GROUNDS TO SUSTAIN CIRCUIT COURT'S FINDINGS IN LAW CASE.—Where exceptions of appellant, plaintiff, complained of error in not directing a verdict for plaintiff and in not excluding certain evidence, and respondent asked that verdict for her be sustained on additional grounds that Court erred in not granting nonsuit on grounds specified in motion and in not directing verdict for her, and that Court should have sustained respondent's position that note sued on was subject to all defenses arising out of fraudulent representation, *held*, respondent cannot have additional grounds to sustain findings of Circuit Court in law case.

2. GAMING—PLEDGED NOTE IN RENEWAL OF NOTES GIVEN FOR STOCK TO BE HELD AND RESOLD BY SELLER, AT CERTAIN PROFIT, No STOCK BEING DELIVERED OR PROMISED, HELD VOID (CIV. CODE 1922, §§ 5165, 5169).—Where defendant executed notes for corporate stock, but party selling stock agreed to resell it at a profit of a certain amount, and neither delivered, nor promised to deliver, stock to defendant, and defendant later executed one note in renewal of such notes, and bank having same pledged it with another bank, pledged note was void under Civ. Code 1922, §§ 5165, 5169, relating to sale or transfer, at future time, of stock.

Before SEASE, J., Marlboro.    Affirmed.

Action by the Baltimore Trust Company against Lila M. Stanton. From a judgment for defendant, plaintiff appeals.

Respondent asked that the judgment be affirmed on the following additional grounds:

(a) That his Honor, the presiding Judge, committed error in not granting the nonsuit on the motion of the respondent upon the grounds specified in the motion.

(b) That his Honor, the presiding Judge, should have granted the motion of respondent for a directed verdict upon the grounds specified.

(c) That his Honor, the presiding Judge, should sustain the position of the respondent that the note in question was subject to all defenses arising out of fraudulent representation.

*Messrs. Tison & Miller,* for appellant, cite: *Plaintiff entitled to directed verdict:* Sec. 5165, Code. *"Novation":* 122 S. E., 868; 54 S. E., 757. *When payable "on demand":* Sec. 3558, Code. *When secondary liability discharged:* Sec. 3771, Code. *"Negotiable instrument":* Sec. 3652, Code; 17 Ann. Cas., 52; Ann. Cas., 1912-B, 412. *Provision for extension of time after maturity does not destroy negotiability:* 3 R. C. L., 9-10; 8 C. J., 140, Sec. 243.

*Messrs. McColl & Stevenson,* for respondent, cite: *Negotiable note must be certain as to date of payment:* 3 R. C. L., 910. *General rule is that provision in note for indefinite extension of time for payment renders same nonnegotiable:* 32 Ann. Cas., 211; 113 Pac., 1052; 17 A. L. R., 857; L. R. A., 1919-A, 432; 125 A. S. R., 201; 47 N. E., 224; 34 N. E., 1004; 94 A. S. R., 272; 42 N. W., 296; 39 Fed., 262; 164 N. W., 788; 93 Pac., 508; 186 N. W., 927; 72 Pac., 842; 212 Fed., 56; 36 N. E., 378. *Note at bar void under future statute:* Secs. 5165, 5169, Code; 133 S. E., 617; 26 S. C. L., 224; 9 S. C. L., 200; 2 Bay, 23; 7 L. R. A., 1918-C, 769. *Same, not changed by uniform negotiable instruments act:* 8 C. J., 764, 768; 8 A. L. R., 309; 3 R. C. L., 910; 11 A. L. R., 207.

April 11, 1928.

The opinion of the Court was delivered by MR. CHIEF JUSTICE WATTS.

This suit involves the validity of a note given by the respondent, Lila M. Stanton, to the Bank of Clio and by the Bank of Clio pledged with the Baltimore Trust Company for a loan.

On or about June 25, 1920, Mrs. Lila M. Stanton executed three notes, each in the sum of $2,500, which were by her delivered to a man by the name of O. G. Hale, who, at the same time, it is claimed by Mrs. Stanton, gave her a written memorandum on a yellow stock receipt. These notes were each payable to "myself," and were by the said O. G. Hale delivered to the Bank of Clio for a certificate of deposit in that bank, payable in the fall of 1920. Thereafter, upon the notes coming due, they were renewed either once or twice; and finally, at last, converted into one note for $7,500, payable to the Bank of Clio, and by the Bank of Clio assigned by blank indorsement to the Baltimore Trust Company. Upon such note for $7,500 coming due, and not being paid, suit was instituted and resulted in a verdict by the jury for the defendant, on the issue submitted to the jury by the trial Judge of whether the note was void under the gambling statutes of the State.

The exceptions complain of error in not directing a verdict for the plaintiff and in not excluding evidence and in reference to the Act of the Legislature in regard to "futures." 'The defendant asks that the verdict be sustained on additional grounds.

1    The defendant cannot have additional grounds to sustain the findings of the Circuit Court in a law case.

2    The Act of the Legislature affecting this case, Section 5165 (Civ. Code, 1922), declares:

"Every contract * * * for the sale or transfer at any future time * * * of stock * * * shall be void unless the party contracting, * * * is at the time * * *

the owner or assignee thereof, or is at the time authorized by the owner or assignee thereof, or his duly authorized agent to make and enter into such contract  \*  \*  \*  or unless it is the *bona fide* intention of both the parties  \*  \*  \* at the time of making the same, that the said certificate,  \*  \*  \*  shall be actually delivered in kind  \*  \*  \*  at the period  \*  \*  \*  mentioned and specified  \*  \*  \*"

Section 5166 sets forth:

"That in any and all actions brought in any Court to enforce such contract,  \*  \*  \*  or to collect any note  \*  \*  \* the burden of proof shall be upon the plaintiff to establish that at the time of making such contract  \*  \*  \*  the party making the same was the owner or assignee  \*  \*  \*  or was at the time authorized by the owner or assignee thereof, or his duly authorized agent, to make and enter into such contract,  \*  \*  \*  or that at the time of making such contract  \*  \*  \*  it was the *bona fide* intention of both parties thereto that the said certificate  \*  \*  \*  should be actually delivered," etc.

Section 5169 provides in the statutes that any note given in these circumstances "shall be utterly void, frustrate and of none effect, to all intents and purposes whatsoever."

Here was some kind of a transfer of some kind of an interest in stock to Mrs. Stanton. Who did O. G. Hale represent? We do not know from the proof. Who was the owner of the stock; was it O. G. Hale or some other person? There is no answer in the proof to these questions. It is clear that no stock was delivered to Mrs. Stanton upon the date of the transaction, June 25, 1920. In fact, none was ever attempted to be sent to the Bank of Clio until four months thereafter on October 13, 1920. But there is no claim that the Bank of Clio or any one else ever notified Mrs. Stanton that the Fisheries Products Company had sent this stock to the Bank of Clio. Her unequivocal statement is that no stock was delivered to her or promised to her by Hale, but that he was to keep it and sell it for her at an ad-

vance. Her statement about it is absolutely borne out by his written stipulation of June 25, 1920, given to her simultaneously by Hale when she signed the notes. In this stipulation Hale agreed to sell her stock for not less than $17.50 per share at any time after December 1, 1920. What clearer showing could there be that the parties were merely trading upon margins? Mrs. Stanton went into it to make a profit of $2.50 per share. No stock was delivered to her or promised to her.

Besides, all these issues were submitted to the jury and have been found against the appellant. The points made by appellant in its exceptions seem to be: (1) That the giving of the new note by Mrs. Stanton had the effect of rendering the transaction legal; (2) that the presiding Judge should have excluded all testimony tending to show that the transaction fell under the Futures Act; (3) the presiding Judge should have directed a verdict; (4) that the presiding Judge committed error in not charging that delay in delivery of the stock or delivery to the wrong person would not prevent the contract from being a binding obligation. There was no testimony in this case that there had been a delay in delivery of the stock, nor was there any testimony that there had been delivery to the wrong person. Everything that appeared in the case along this line was the unexplained letter of the Fisheries Products Company of October 13, 1920, found in the vault of the Bank of Clio by H. J. Bennett after he became receiver of the bank. There is absolutely nothing to show that the stock was intended to be delivered any sooner or to any other person than the Bank of Clio. We think that the cases of *Gaillard v. Le Roy,* 1 McMul. (26 S. C. Law), 225, and *Blanchard Press v. Stanton,* 134 S. C., 218; 132 S. E., 617, settled the question. In this latter case Mr. Justice Cothran, in his concurring opinion, says this:

"2. As to the refusal to direct a verdict in favor of the plaintiff: The foregoing observations are conclusive as to the correctness of the presiding Judge's action.

"3. As to errors assigned to the charge: The appellant contends that the presiding Judge committed error in charging the jury that, the contract being for the future delivery of stock, if it did not comply with the requirements of Sections 5165 to 5169; 3 Code of Laws, 1922, it was an illegal and an unenforceable contract, and that a note given in attempted compliance therewith was void, even in the hands of a holder in due course. Section 5169 explicitly declares that a note given under the circumstances forbidden shall be 'utterly void, frustrate and of none effect, to all intents and purposes whatsoever.' The following authorities amply sustain the ruling of the Court below: *Gaillard v. Le Roy,* 1 McMul., 225. *Tidmore v. Boyce,* 2 Mill, Const., 200. *Payne v. Trezevant,* 2 Bay, 23; 3 R. C. L., 910, 1017. *Eskridge v. Thomas,* 79 W. Va., 322; 91 S. E., 7, L. R. A., 1918-C, 769; 8 C. J., 764, 768. *Plank v. Swift,* 187 Iowa, 293; 174 N. W., 236; 8 A. L. R., 309. *Levy v. Doernhoefer's Ex'r,* 188 Ky., 413; 222 S. W., 515; 11 A. L. R., 207."

We see no error as complained of. All exceptions are overruled, and judgment affirmed.

MESSRS. JUSTICES BLEASE, STABLER and CARTER concur.

MR. JUSTICE COTHRAN (dissenting): I am of opinion that the motion of the plaintiff for a directed verdict in its favor should have been granted, and, therefore, dissent from the affirmance of the judgment, indicated in the opinion of the Chief Justice, for the reasons which follow.

This is an action upon a negotiable promissory note, exacuted by the defendant on November 7, 1921, for $7,500, payable January 7, 1922, to the Bank of Clio, with 8 per cent. interest after maturity and 10 per cent. attorneys' fees. The plaintiff claims to have acquired the note from the Bank of Clio as a holder in due course.

The complaint is in the usual form of an action by the indorsee of a negotiable promissory note, assigned for value before maturity and without notice of infirmities therein.

The defendant sets up the following defenses:

(1) A general denial.

(2) A denial of the negotiable character of the note.

(3) Failure of consideration and fraud in the procuring of the note from her, upon her agreement to purchase certain stock which was utterly worthless.

(4) That the note is void, "for the reason that it arose out of a transaction whereby the defendant was promised that certain stocks should be sold or transferred to this defendant at a future time; that no stocks have ever been delivered to this defendant."

The last defense stated is under Section 5165, et seq. of Volume 3, Code, 1922, commonly designated as the "gambling in futures" statute.

The case was tried before his Honor, Judge Sease, and a jury, at a time not stated in the transcript, and a verdict returned in favor of the defendant.

At the close of the testimony for the plaintiff, the defendant moved for a nonsuit, which was refused; and, at the close of the entire testimony, each side moved for a directed verdict, which motions were refused. I do not consider it necessary to restate the grounds of these several motions, as the points raised will be covered by what I have to say.

From the judgment entered upon the verdict for the defendant, the plaintiff has appealed upon exceptions which fairly raise the questions hereinafter considered, and the defendant has served notice to sustain the verdict upon additional grounds stated.

The facts of the case are these: On June 25, 1920, one O. G. Hale approached the defendant, Mrs. Stanton, for the purpose of selling to her stock in the Fisheries Products Company, of Wilmington, N. C. After some negotiation, she agreed to buy 500 shares, par value $10 per share, for $7,500, $15 per share, and executed three notes payable to herself for $2,500 each, payable in the future. The stock

naturally was not in the hands of Hale for immediate delivery, and, according to Mrs. Stanton's testimony, it was to be held by Hale and sold for her at an advance. Hale took these notes to the Bank of Clio, and, without other indorsement than that of Mrs. Stanton (the notes having been made payable to "myself"), discounted them at the bank, receiving therefor a certificate of deposit. (It does not distinctly appear to whom the certificate of deposit was made payable, but, as the corporation issued stock in compliance with the sale made by Hale, it is fair to assume that the certificate of deposit was made payable to it.) As the three notes held by the Bank of Clio severally became due, Mrs. Stanton renewed them, paying the discount, and, on November 7, 1921, consolidated the three notes in a renewal note for $7,500, the subject of this action. That note was immediately discounted by the Bank of Clio with the plaintiff, Baltimore Trust Company, and transferred to them. In the meantime Mrs. Stanton was corresponding with Hale and the corporation in reference to the sale of the stock, and received a dividend, in the shape of a fertilizer credit, from the corporation, which she used in purchasing fertilizers. A certificate of stock for 500 shares was executed by the corporation in September, 1920, in Mrs. Stanton's name, and transmitted to the Bank of Clio, in October following, with directions to attach it as collateral security to the note of Mrs. Stanton. It does not appear that this action was authorized by Mrs. Stanton or known to her. It has developed that the Fisheries Product stock is utterly worthless, and naturally Mrs. Stanton is unwilling to pay the note, if there be any possible chance to resist its payment; a disposition with which any one would sympathize. In my opinion, however, the law is against her, and she is face to face with the fate of many who have put negotiable notes in the channel of commerce.

Upon the trial, his Honor, the presiding Judge, excluded from consideration all questions except the defense that the

note sued upon was void under the gambling in futures statute.

Abbreviated, the statute provides: "Every *contract* * * * *for the sale or transfer* at any future time * * * of stock * * * shall be void, unless the party contracting * * * to sell or transfer the same, is at the time of making such contract, * * * the owner * * * thereof, or is at the time authorized by the owner thereof * * * to make and enter into such contract, * * * for the sale or transfer of such certificate * * * or unless it is the *bona fide* intention of both parties to the said contract," respectively, to deliver and receive, in kind, the certificate agreed to be sold and transferred, at the period in the future mentioned and specified in the contract.

Under Section 5166, in an action for the collection of a note founded upon such a contract, the burden of proof is upon the plaintiff to prove that, at the time of making such contract, the seller was the owner, etc., thereof, or that it was the *bona fide* intention of both parties, respectively, to deliver and receive, as above indicated.

It is settled by the decisions of this Court, notably in the case of *Blanchard Press v. Stanton* (the same defendant as in the case at bar), 134 S. C., 218; 132 S. E., 617 (citing many cases), that a note given in attempted compliance with a contract illegal under the gambling in futures statute is void, even in the hands of a holder in due course.

The Circuit Judge held, and correctly, I think, in excluding all other questions than the defense under the statute that the plaintiff was presumptively a holder in due course of the note sued upon; for the possession of a note, properly transferred, carries the presumption that the plaintiff is a holder in due course. *Blanchard Press v. Stanton,* 134 S. C., 218; 132 S. E., 617. *Farr-Barnes Co. v. St. George,* 128 S. C., 67; 122 S. E., 24, and cases cited therein.

In order to provoke any discussion at all upon the issue of the applicability of the gambling in futures statute, it is

essential that there have been some evidence tending to sustain the allegation· in the answer, that the note "arose out of a transaction whereby the defendant was *promised that certain stocks should be sold and transferred* to this defendant, *at a future time*"; for, if the transaction was an immediate, present sale of the stock, it would not come within the purview of the statute relating to *contracts for the sale* of stocks. There is no inhibition in the statute in reference to a sale *in præsenti,* and a delivery *in futuro.*

I think that no other reasonable inference can be drawn from the evidence than that the parties intended a sale *in præsenti,* the delivery to be consummated as soon as practicable. The party negotiating the sale was manifestly a canvassing agent for the Fisheries Products Company to sell its stock. He is not supposed to carry along with him a supply of blank certificates, to be filled out as he took a subscription for stock. How else could he have handled the matter than by obtaining Mrs. Stanton's note for the stock, to be delivered after reporting the transaction to the company? Mrs. Stanton understood that she was buying 500 shares and giving her note for them. She testified:

"Q. Now, then, on that occasion, the occasion of Hale's second visit to you, did you sign any papers? A. I did.

"Q. *Were they* what we have been calling *the original notes for the Fisheries Products stock?* A. *Yes.* * * *

"Q. What was the understanding, if any, that you had with Mr. Hale about the delivery of the stock to you? *Who was to keep the stock?* A. *He was going to sell it for me; it was an investment I was making.* * * *

"The Court: Let me see if I understand her statement. This man Hale *sold* her the stock at 15, and later said that ·he would sell the stock at a margin of $2.50.

"Mr. McColl: *Yes, sir; and in the meantime Hale was to keep possession of the stock.* * * *

"Q. What was the understanding between you and Hale as to whether the stock was to be delivered to you or not?

A. He did not say anything about delivering the stock, *but he said he would sell the stock for me."*

She testified:

That, after December 1, 1920, she wrote to Hale, *about selling the stock,* but received no reply; that she then wrote to the Fisheries Products Company, and received a reply that "they did not handle *the sale of stock."* Evidently, she was writing about the sale of *her stock,* which would have been senseless if she had not owned the stock, which, according to her own statement, Hale was to hold and sell for her. Later she received a dividend, in the shape of a fertilizer credit or deduction, upon the stock, which hardly would have occurred if the stock had not been owned by her and in her name.

"Q. You expected to take that stock, that was what you signed that note for, wasn't it, you expected to take it, didn't you? * * * A. *Well, he talked me into it.*

"The Court: The question is whether or not you intended to take the stock at the time you bought it.

"The witness: *I intended to take it,* with the understanding that he would sell it. * * *

"Q. And you meant for that note to pay for that particular stock, did you not, Mrs. Stanton? A. *I evidently did.* * * *

"Q. Now, Mrs. Stanton, there is not any question about this, you gave that note to pay for that particular stock, didn't you? A. *Yes.*

"Q. And you expected this man, as your agent, to resell it for you, didn't you? A. *I expected the man that sold it to me to sell it.*

"Q. *For you?* A. *Yes.* * * *

"Q. I asked you if they did not give you this (the dividend), because of your being a stockholder, or because you had agreed to purchase stock, regardless of what you considered? A. Yes; * * * I can answer, that I expected

to pay it (the note) with money for (from?) the sale of the stock, and I expected to have some money over.

"Q. You knew you were making a binding trade when you signed the note? ·A. *With the company;* I did not know it was a note that would go to the bank and be discounted."

I think that the testimony of Mrs. Stanton as above set forth plainly develops a case of executed sale, and not one of an executory contract for a sale.

"If there is not, under any circumstances, to be a delivery as part of and completing, then the transaction is a mere wager on the rise and fall of prices; but if there is, in good faith, a purchase, *the delivery may be postponed,* or made to depend on a future condition, and the stock carried on margin or otherwise in the meantime, without affecting the legality of the operation." 12 R. C. L., 752, 753.

"Where there is an unconditional contract for the sale of specific goods in a deliverable state, unless a different intention appears, the property in the goods passes to the buyer when the contract is made, without payment of the price or delivery of the goods." 35 Cyc., 279 (citing cases from many States, including *Frazer v. Hilliard,* 2 Strob., 309).

"A contract for the sale of a stock of millinery goods, under which nothing remained to be done to determine the quality, quantity, or value of the goods, and all that remained to be done was to check up the invoice furnished by the seller to ascertain what deduction should be made on account of goods sold out of the stock subsequent to the time the invoice was furnished, was an executed, and not an executory contract." *Thomas v. Thomas,* 146 Ala., 553; 41 So., 141.

Delivery is not essential to the consummation of a contract of sale and the passing of the title, if the chattel is identified, unless the contract specifically makes delivery essential. *U. S. v. R. P. Andrews,* 207 U. S., 229; 28 S. Ct., 100; 52 L. Ed., 185. *Harris v. Egger* (C. C. A.), 226

F., 389.   *Potts v. Benedict,* 156 Cal., 322; 104 P., 432; 25 L. R. A. (N. S.), 609.   *Welch v. Elevator Co.,* 122 Minn., 432; 142 N. W., 828.   *Johnson v. Tabor,* 101 Miss., 78; 57 So., 365.

"In accordance with the rule already stated, unless otherwise provided by statute, or unless a contrary intention appears, on a sale of specific goods the property will pass as between the parties without a delivery of the goods, *especially where there has been payment of the price.*"   35 Cyc., 303.

In note to 49 Am. Dec., 325, Judge Freeman says:

"By the common law, independently of the statute of frauds, a present sale of specific ascertained goods was complete, as between the parties, *without delivery,* as soon as the terms of sale were agreed on and the bargain was struck, nothing remaining to be done to put the goods in a deliverable state, and the property was thereby vested in the buyer, and was at his risk"—citing a number of cases, including *Frazer v. Hilliard,* 2 Strob., 309.

"There is a material distinction between *a sale* and a mere *executory contract for a sale.*   In the one case the title to the goods passes to the buyer; in the other it remains with the seller.   The contract is said to be *executory* when there remains something to be done, the performance of which is a condition precedent to the transfer of the property, and *executed* when the thing and price have been assented to, and nothing remains to be done to prevent the transfer of the property."   23 R. C. L., 1346.

"A purchase of stock for speculation, made in good faith and contemplating actual delivery, is not a gambling transaction, and *delivery may be postponed* or made to depend on a future condition, and the stock carried on margin or otherwise in the meanwhile, without affecting the legality of the operation."   *In re L. H. Taylor & Co.'s Estate,* 192 Pa., 304; 43 A., 973; 73 Am. St. Rep., 812.

A purchase of stocks on margin which contemplates the actual delivery of the stock, and the full payment of the price, if demand is made therefor, is a *bona fide* purchase, and not invalid as a wager. *Winward v. Lincoln,* 23 R. I., 476; 51 A., 106; 64 L. R. A., 160.

"There is no gambling transaction where the broker buys what he is ordered to buy, and sells what he is told to sell, *though there is no delivery* to the principal, the stocks and bonds being kept by the broker, and delivered on a resale to the one then buying." *Young v. Glendenning,* 194 Pa., 550; 45 A., 364.

"If the customer intends to buy, and not merely to settle on differences, dealing in stocks, even on margins, is not gambling." *In re Taylor & Co.'s Estate,* 192 Pa., 304; 43 A., 973; 73 Am. St. Rep., 812.

"Where an actual purchase is contemplated and the parties act in good faith, the fact that speculation is the object is of no legal importance." *Gregory v. Wendell,* 40 Mich., 432.

"Real purchases and sales of stocks on margin are not gambling transactions, though they are done partly or wholly on credit." *Hopkins v. O'Kane,* 169 Pa., 478; 32 A., 421.

A contract to deal in stocks on margin is not illegal; the stocks being actually purchased, and the contract not being one for mere payment of differences. *Hatch v. Douglas,* 48 Conn., 116; 40 Am. Rep., 154.

One might as well characterize as a *contract for sale* at a future time a *closed contract* for the purchase of a steam engine or a sewing machine to be delivered at a certain time. If the selling agent does not happen to have carried the engine along with him for immediate delivery, the *sale* must be construed to be a *contract for a sale* in the future, which is absurd.

But assume, for the sake of argument, that Mrs. Stanton did not buy the stock *in præsenti,* but made a *contract* for the future sale and transfer of the stock, the necessary elements of proof required of the plaintiff are thus defined:

In *Riordan v. Doty,* 50 S. C., 537; 27 S. E., 939, the Court, by the late Justice McIver, said:

"The manifest object of this legislation was to cut up by the roots all transactions for the purchase or sale of cotton or other products mentioned in the statute for future delivery, by declaring the same absolutely void, unless some one or more of the conditions mentioned in the statute were present at the time such transactions were entered into, and by imposing the burden of proof of the presence of one or more of such conditions at the time stated, upon the party bringing any action to enforce such contract, or any claim or demand whatever founded upon any such contract.   So that it is very clear that when a plaintiff brings an action for either of those purposes, he must show either one or more of the following facts:   1st. That the party making the contract for the sale of cotton for future delivery was the owner or assignee thereof at the time the contract was made; *or 2d.* That the seller was at the time authorized by the owner or assignee, *or* his duly authorized agent, to make such sale; *or* 3d. That it was the *bona fide* intention of both parties—seller and buyer—at the time of making such contract, that the cotton should be actually delivered and received in kind at the future period mentioned."   *Harvey v. Doty,* 50 S. C., 548; 27 S. E., 943.   *Riordan v. Doty,* 56 S. C., 111; 34 S. E., 68.   *Harvey v. Doty,* 54 S. C., 382; 32 S. E., 501.   *Barr v. Satcher,* 72 S. C., 35; 51 S. E., 530. *Maybank v. Rogers,* 88 S. C., 572; 71 S. E., 48.   *Gwathney v. Burgiss,* 98 S. C., 152; 82 S. E., 394.   *Anderson v. Thomas,* 138 S. C., 228; 136 S. E., 387.

It cannot be disputed that the stock, however worthless it may have been, was owned by the Fisheries Products Company, and that Hale was their agent in disposing of it.   He immediately discounted the notes of Mrs. Stanton with the Clio Bank, and received for the Fisheries Products Company a certificate of deposit payable some months thereafter.

On September 28, 1920, the certificate of stock was issued (at least signed) by the officers of the corporation; and on October 13 it was mailed to the Bank of Clio by the corporation, with directions to hold it as collateral security to Mrs. Stanton's notes. They may have had no right to do this, as Mrs. Stanton had not directed or authorized its deposit with the bank as collateral to her notes;· but the ·fact that the certificate was issued in the name of Mrs. Stanton, and forwarded by the corporation to the bank, is proof conclusive that the corporation received the benefit of the transaction of Hale, and ratified it. They say in their letter to the bank, referring to the certificate of stock, with· others:

"Which we are sending to be attached to the notes as collateral, as per arrangement with *you* by *our representative.*"

The next essential is that both Mrs. Stanton and Hale, acting as agent for the corporation, intended actual delivery of the stock.

In the testimony of Mrs. Stanton, a part of which is quoted above, it is absolutely clear that she bought the stock, gave her note for it, and arranged with Hale to sell it for her. Not only this, but she wrote to Hale to inquire about the *sale of her stock;* she wrote to the corporation to inquire about the *sale of her stock;* she accepted and used a dividend declared upon the stock, and acknowledged in her testimony that it had been sent to her *because she was a stockholder.* Not only this, but she renewed from time to time, with the Bank of Clio, which had discounted them for the Fisheries Products Company, the original notes, paying the discount, and, as late as November 7, 1921, consolidated the three notes of $2,500 each, which had been running for seven months, and upon which she had paid discounts amounting at least to $300 or $400, into the $7,500 note, due January 1, 1922, assigned by the Bank of Clio to the plaintiff.

That the corporation intended actual delivery of the stock is demonstrated by the fact that the certificate was actually

executed on September 18, 1920, and transmitted to the Bank of Clio on October 13, who, doubtless the corporation thought, was entitled to hold it as collateral. However mistaken they may have been in this action, it shows that, according to the original trade with Hale, the stock was intended to be delivered to or for Mrs. Stanton.

It seems to me, therefore, that the evidence for the plaintiff, aided materially by the testimony of Mrs. Stanton, overwhelmingly establishes the three essentials that the corporation owned the stock at the time of the trade; that Mrs. Stanton never expected anything other than a delivery of the stock to herself, or to Hale to sell for her; and that the corportion could have intended nothing less than the actual delivery of the stock.

It seems to me that the evil intended to check by the statute was gambling upon the rise or fall of cotton, stocks, and other commodities named; that is to say, a settlement upon the difference in the market at the time of the maturity of the contract. It was not aimed at *completed sales,* for in that case the difference in the market price at the time of delivery would be a matter of indifference to the seller. There is not a suggestion in the case that Mrs. Stanton intended to settle upon differences. She declares again and again that she bought the stock as an investment; that she expected Hale to sell the stock for her, and out of the proceeds of sale she would pay her notes and "have something over"; that she gave the notes for the stock as an investment.

It may be suggested that the note given by Mrs. Stanton stamps the transaction as executory. Unfortunately for this position, the case of *Frazer v. Hilliard,* 2 Strob., 309, is direct authority to the contrary. Quoting syllabus:

"Any consideration which the seller agrees to accept as the price of his goods, is equivalent to the purchase money; and neither the performance of the consideration, nor the payment of the purchase money, can be construed into a condition precedent to any legal transfer of the goods."

I have no patience with the defunct and swindling corporation, but I do have regard for the integrity of commercial transactions, in the absence of the least improper conduct of the plaintiff bank, which let out its money upon the paper which the defendant, with inexplicable recklessness, turned loose, "a courier without bag or baggage." As the Court says in *Citizens' Trust & Savings Bank v. Stackhouse*, 91 S. C., 455; 74 S. E., 977; 40 L. R. A. (N. S.), 454:

"But it is of vastly more importance to the commerce of the country that the integrity * * * of negotiable paper, in the hands of *bona fide* holders for value, shall be maintained by the Courts than that persons who carelessly put their names to such paper shall be relieved of liability thereon."

I do not at all agree with the construction placed by counsel for the defendant, and in the leading opinion, upon the memorandum given to Mrs. Stanton by Hale at the time the trade was made. It reads:

"This is to certify that I will sell all or any part of the investment in Fisheries Products Company of Wilmington, N. C. Further agree to sell for not less than $17.50 per share—at any time after December 1st, 1920."

In the argument of counsel, it is stated:

"Hale was to keep and handle the stock and guaranteed to sell same after December 1, 1920, at an advance of $2.50 per share."

I cannot extract such a guaranty from the memorandum. If he had bound himself to *buy*, the situation might have been different. It indicates, in either event, more strongly than anything else, that the sale was *in præsenti*, and that, as counsel states, "Hale was to keep and handle the stock" for Mrs. Stanton.

In the leading opinion, it is stated:

"Her unequivocal statement is that no stock was delivered to her or promised to her by Hale, but that *he was to keep it and sell it for her at an advance*. Her statement about it

is absolutely borne out by his written stipulation of June 25, 1920, given to her simultaneously by Hale when she signed the notes."

I cannot conceive of stronger evidence that she intended to receive actual delivery of the stock through Hale as her agent.

If Hale had executed an absolute guaranty that after December 1 Mrs. Stanton should receive a profit of $2.50 per share upon her stock, *"her investment in Fisheries Products Company,"* I cannot imagine more conclusive evidence, as she herself declares over and over again, that she intended to buy the stock.

The case of *Blanchard Press v. Stanton,* 134 S. C., 218; 132 S. E., 617, is not at all parallel with the case at bar. That case was specifically decided upon the knowledge, information, and conduct of *the plaintiff, the transferee* of the note; that there were such circumstances connected with the dealings of the parties as to put the transferee on notice, and to deprive it of the rights of a holder in due course; while in the case at bar there is not a circumstance, even of suspicion, that was calculated to affect the status of the plaintiff as a holder in due course.

The *Blanchard case* is cited by counsel for respondent upon the point only that a holder in due course is not protected against the illegality of the note.

I think that the plaintiff's first request to charge should have been allowed. I do not think that there can be a doubt of its correctness. It was this:

"If two parties make an agreement for the future delivery of any commodity set forth in the statute referred to, and if it is the *bona fide* intention of both parties at the time that such commodity shall be delivered by one and received by the other at the time agreed to, then I charge you as a matter of law that the failure to deliver or receive by either party at the agreed time, or any delay in delivery, would not affect the contract, so as to keep it from being a good and

binding contract. Nor would the delivery to the wrong person, the conditions described by the statute being present, keep the contract from being a good and binding obligation."

My opinion is that the judgment should be reversed and the case remanded to the Circuit Court, with direction to enter a judgment in favor of the plaintiff for the amount claimed; at any rate, that the first exception should be sustained, and a new trial had.