418 A.2d 320

**COMMONWEALTH of Pennsylvania**

v.

**Clair L. BOLLINGER and Donald G. Schlosser, Appellants.**

Superior Court of Pennsylvania.

Argued and Submitted March 13, 1978.

Filed Dec. 21, 1979.

114

Sheryl Ann Dorney, Assistant District Attorney, York, for Commonwealth, appellant, Nos. 363 and 364, March Term, 1977.

Harold N. Fitzkee, Jr., York, for Bollinger and Schlosser.

Donald L. Reihart, District Attorney, York, submitted a brief on behalf of Commonwealth, appellee.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

SPAETH, Judge:

We are concerned with four separate appeals—one by one co-defendant, one by the other co-defendant, and two by the Commonwealth. Each of the co-defendants alleges that he should be discharged on the ground that the evidence was insufficient to sustain his convictions, and, in the alternative, that he is entitled to a new trial. The appeals filed by the Commonwealth challenge the refusal of the lower court to order the co-defendants to make restitution, or to tax the costs of prosecution to the co-defendants. The appeals were consolidated, and this opinion disposes of all four appeals.

The facts are set forth in Judge PRICE's dissenting opinion. For the reasons stated in Judge PRICE's opinion and footnote 1 of this opinion, a majority of the court

believes that all of Donald Schlosser's convictions must be vacated for want of sufficient evidence, and that for the same reasons all of Clair Bollinger's convictions, except his. conviction of forgery, must also be vacated.[1]  In Part I of

1. As the discussion below indicates, the majority believes the evidence was sufficient for the jury to find that Bollinger wrongfully obtained money from the City of York on the basis of false bills he prepared and submitted to the City for payment.  However, in doing so, Bollinger did not commit larceny by employee.  A person is guilty of larceny by employee if

> being in the employ of another, by virtue of such employment, [he] receives and takes into his possession any chattel, money or valuable security, which is or may be made the subject of larceny, for, or in the name, or on account of his employer, and fraudulently embezzles the same, or any part thereof, although such chattel, money or security was not received into possession of such master or employer otherwise than by the actual possession of his employee  .    .  ..

Act of June 24, 1939, P.L. 872, § 815, 18 P.S. § 4815, *repealed by* the Act of Dec. 6, 1972, P.L. ——, No. 334, § 5.

This statute, as the Historical Note accompanying it makes clear, was designed to eliminate a loophole existing at common law that allowed criminally culpable employee to escape punishment.  At common law it was

> not larceny in a servant or other employé, to convert to his own use property received by him for the use of his master or employer, which had never otherwise been in the possession of such master or employer, and where such servant or employé has done no act to determine his original lawful and exclusive possession, as by depositing the goods in the master's house or the like.  .    .    A nice and highly artificial distinction between what was, and what was not, a sufficient possession in the master of the property purloined, [thus] enabled the offenders to escape with impunity.  It [was] to obviate such results, which are really discreditable to criminal justice, and to protect masters and employers from the want of fidelity of those in whom they are compelled, from the exigencies of business, to confide, that this section was introduced.

Historical Note to 18 P.S. § 4815 (1963).

When Bollinger received money from the City on the basis of the false bills he prepared and submitted, he did not violate this statute because he was not receiving property from a third party "for, or in the name, or on account of his employer [*i. e.* the City]."  Bollinger may have been guilty of other offenses when he received the money from the City—*e. g.* cheating by fraudulent pretenses, 18 P.S. § 4836 (1963) or embezzlement by public employee, 18 P.S. § 4822 (1963).  Indeed, the Commonwealth indicted Bollinger on these offenses.  However, since at trial the lower court sustained Bollinger's demurrer to these charges, and since the Commonwealth has not appealed from the lower court's order, it is unnecessary to decide whether the Commonwealth's evidence would have been sufficient to convict Bollinger of these offenses.

this opinion, the majority of this court sets forth its reasons for sustaining Bollinger's conviction of forgery. Part II of this opinion addresses the issues raised in the Commonwealth's appeals.

## I.

The Commonwealth indicted Bollinger in a single bill for four separate forgeries. The jury found him guilty on all charges of forgery, and the lower court sentenced him to three years probation (to run consecutively to Bollinger's sentence for misbehavior in office) and fined him $3000. While we have some doubts concerning the sufficiency of the evidence concerning one of the forgeries,[2] we are satis-

Furthermore, the majority agrees with Judge PRICE that the Commonwealth failed to prove that Bollinger was guilty of larceny by employee based upon the other incidents mentioned by the lower court. We note, however, that we do not subscribe to the dissent's statement that this failure of proof is tied to the $1,500 to $1,700 remitted by Bollinger to the City in 1974. That money comprised only rental monies collected in 1974; it did not comprise monies received in preceding years; N.T. at 184. However, the Commonwealth stipulated that the City received checks from the Memorial Stadium Fund in 1973 totalling $1,303.68, N.T. at 387, and failed to show that this remittance was insufficient to cover the amount owed by Bollinger to the City prior to 1974.

Also, for reasons similar to those mentioned above, the majority believes that Commonwealth's proof was insufficient to convict Bollinger for theft by failure to make required disposition of funds, and that the evidence was insufficient to support Schlosser's convictions. Although the evidence showed that Schlosser negligently mishandled the City's affairs by failing to detect Bollinger's forgeries and by instituting procedures that allowed Bollinger to commingle the City's funds in a private bank account, we do not believe that the Commonwealth's proof rose above a showing of incompetence to the level of bad faith or corrupt motive necessary for a conviction for misbehavior in office.

Finally, the author of this opinion wishes to note that although the majority of the court has concluded that the evidence was insufficient to sustain Bollinger's conviction of misbehavior in office, this author believes that the evidence was sufficient. *See generally Commonwealth v. Steinberg*, 240 Pa.Super. 139, 362 A.2d 379 (1976); *Commonwealth v. Green*, 205 Pa.Super. 539, 211 A.2d 5 (1965).

2. This forgery concerned a check that was issued by the City of York to Charles Moul, Sr., for work allegedly performed at the Memorial Stadium Complex. At trial, Moul could not remember whether or not he performed this work, and did not state what amount, if any,

fied that the evidence was sufficient to prove that Bollinger committed the other three forgeries charged. Furthermore, we find no merit in any of Bollinger's arguments for a new trial.

### First Forgery

Reviewing the evidence at trial in the light most favorable to the Commonwealth, the following facts were established. In May or June 1972 Bollinger, who was the Superintendent of Memorial Stadium, handed a bill to Schlosser's secretary that stated:

Sir: To install and complete fence around Memorial Two Diamond 1700′ of 60″ fence and 600′ of 42″ fence. $458.00. Thank you, Fred Fuller, 160 Hamilton Avenue, York, Pennsylvania.

Since the bill carried the written O.K. of Schlosser, the secretary prepared a purchase order for it and took the purchase order to the City Treasurer's Office. The Treasurer's Office then issued a check payable to Fred Fuller in the amount of $458. Instead of forwarding the check to Fuller, however, the secretary held it for Bollinger on Bollinger's and Schlosser's instructions. The check, which was introduced as an exhibit, indicated that it had been endorsed by Fuller and Bollinger, as Fuller's agent. However, Fuller testified that he never submitted the above bill to anyone, never received the check or money for the check, never signed the check, and never gave Bollinger permission to sign checks for him. A stipulation was agreed to by counsel that Bollinger endorsed both his and Fuller's names on the check and that it had been deposited in Bollinger's personal checking account.

■ To convict Bollinger of forgery, the Commonwealth was required to prove 1) the false making of some instrument in writing that was apparently capable of affecting a fraud and working an injury to another; and 2) a fraudulent

he received from Bollinger for whatever work he may have performed.

intent. *Commonwealth v. DiPiero*, 205 Pa.Super. 312, 208 A.2d 912, *allocatur refused* 205 Pa. Superior Ct. xxxvii (1965), *cert. denied* 382 U.S. 992, 86 S.Ct. 574, 15 L.Ed.2d 479 (1966). No question exists that Bollinger processed a false bill, and that the bill was capable of effecting a fraud on the City. The only issue is whether Bollinger intended to defraud the City in preparing the bill and depositing the City's check in his personal checking account. The dissent maintains that this intent was not proved because

> the testimony of [the witnesses] supported Bollinger's claim that they were paid for additional work for which Bollinger was not reimbursed by the city, and that he paid for part of the materials used in maintaining the stadium complex. Thus, while an immediate 'profit' appears to have been made . . . we [do not] feel that prejudice on the part of the city could be established absent testimony regarding the bottom line of Bollinger's activities. No evidence was presented to support a finding that he obtained an ultimate profit nor that the operation was conducted with an intent to defraud . . . the city . . . .

Dis. op. at 138.

We disagree both with the dissent's factual statement that the testimony supports Bollinger's claim that he did not profit by depositing Fuller's check into his personal bank account and with the dissent's legal conclusion that in order to establish Bollinger's fraudulent intent the Commonwealth had to establish "the bottom line of Bollinger's activities."

First, Fuller's testimony did not support Bollinger's claim that he paid for part of the materials used in improving the stadium complex. The only testimony given by Fuller on this score was that he did not supply the fence he installed at Memorial Two Stadium but that Bollinger did. N.T. at 244. The natural inference from this statement is not that Bollinger paid for the fence, a fact concerning which Fuller had no apparent knowledge, but that as Supervisor of Me-

morial Stadium, Bollinger had the fence delivered to the installation site for Fuller to install.[3]

Second, Fuller's testimony does not establish that Bollinger paid $458 out of his own pocket for work done by Fuller for the City. The record shows that Fuller may have done work for the City at other times and other parts of the Memorial Stadium Complex for which Bollinger paid him from his personal funds. For example, in August and September of 1971, or approximately nine months before the date of Bollinger's fictitious bill, Fuller installed fence around another ball diamond for which Bollinger paid him by personal checks. However, only two or three checks were involved, the largest one being in the amount of $28.05. N.T. at 249, 255. Furthermore, although Fuller also stated that he sometimes received cash payments from Bollinger, he did not say when these payments were received or what they were for. Since Fuller testified that he and his wife rendered Bollinger numerous personal services at Bollinger's house and elsewhere, *see, e. g.*, N.T. at 251, 257, the jury could have concluded that at least some of these payments were for services that did not benefit the City. Moreover, Fuller stated that he was paid by the City for installing the fence listed in Bollinger's bill, N.T. at 256, and that all the fence he put up was on City time, except for 75 feet, N.T. at 257.[4]

■ Third, the law has never required proof that the accused has obtained "an ultimate profit" in order to establish the fraudulent intent necessary for a forgery conviction. Intent to injure or defraud may be inferred from the doing of wrongful, fraudulent, or illegal acts which in their necessary results naturally produce loss or injury. *Common-*

3. It may be noted that the fictitious bill Bollinger prepared in Fuller's name was only for the installation and completion of a 2,300 foot fence. The bill did not state that it included the cost of the fence itself.

4. Also, it may be noted that although Fuller acknowledged one other specific payment from Bollinger, a $400–$450 loan to go to Hawaii, Fuller subsequently repaid $260–$270 of the loan by endorsing over his City paychecks to Bollinger.

*wealth v. Wheeler,* 200 Pa.Super. 284, 189 A.2d 291 (1963); *Commonwealth v. Grant,* 121 Pa.Super. 399, 183 A. 663 (1936); *Commonwealth v. Huster,* 118 Pa.Super. 24, 178 A. 535 (1935); *Commonwealth v. Brown,* 96 Pa.Super. 13 (1929). In cases analogous to the present one we have looked to the totality of the defendant's conduct to infer fraudulent motive. *See Commonwealth v. Bhojwani,* 242 Pa.Super. 406, 364 A.2d 335 (1976); *see also Commonwealth v. Francis,* 201 Pa.Super. 313, 191 A.2d 884 (1963), *cert. denied,* 375 U.S. 985, 84 S.Ct. 517, 11 L.Ed.2d 472 (1964). Here the Commonwealth proved that Bollinger prepared a fictitious bill for work that the City had already paid Fuller for doing. It further proved that Bollinger obtained the check issued by the City to Fuller on the basis of this bill, signed Fuller's name on the check, and then had the check deposited in his personal checking account. Bollinger's deception of the City underlies this entire episode, and this deception, establishes Bollinger's fraudulent intent. Otherwise, if Bollinger sought only reimbursement for City expenses he personally incurred, why did he not simply submit a bill to the City in his own name for those expenses?

The dissent faults the Commonwealth for failing to prove that Bollinger did not return in some manner the $458 he obtained from the City through deceit. In other words, the dissent requires the Commonwealth to trace Bollinger's entire income and expenditures during the years he was Supervisor of Memorial Stadium and prove that the expenses he incurred on the City's behalf were less that the $458 he took from the City. In other situations, we have noted the difficulty in tracing specific monies through a commercial checking account. *See Commonwealth v. Crafton,* 240 Pa.Super. 12, 367 A.2d 1092 (1976). Here, Bollinger supervised substantial improvements to the City's Memorial Stadium Complex, involving a great many transactions with suppliers, contractors, and laborers. If the law demanded the proof that the dissent says it demands, in many cases a public or private employee would be immune from conviction for defrauding his employer, since it would be impossi-

ble to prove that at some point during his employment he never returned the value of the property he wrongfully obtained through extra services or by the voluntary payment of the employer's miscellaneous expenses.

Furthermore, the proof the dissent requires of the Commonwealth would not establish that Bollinger's intent was fraudulent. Supposing that the Commonwealth were able to trace all of Bollinger's income and expenditures during the period he was Supervisor of Memorial Stadium and the net tally showed an unauthorized profit for Bollinger of $458, this proof still would not show that Bollinger's retention of the funds resulted from fraud rather than mistake. What establishes Bollinger's fraudulent intent is the deception he used to obtain City funds for personal use in the absence of any apparent legitimate explanation for his actions.[5]

### Second and Third Forgeries

The Commonwealth's evidence established that in August or September of 1971 Bollinger handed two bills to Schlosser's secretary, both purportedly from William Mitchell. The first bill stated that it was for repairing the backstop on Memorial Two Diamond, for raising the infield with topsoil and sand, and for taking down old snow fence and replacing it with new. The bill was in the amount of $745. The second bill stated that it was for:

> Work done on Memorial One Softball Field: Spread topsoil and mix with existing infield to raise infield 5 inches by hand rake, $795.00. Tear down old backstop and erect new chain link backstop, total being $1,125.00. Thank you, William Mitchell.

Both bills carried the written O.K. of Schlosser, and the secretary prepared purchase orders for the bills, and forwarded them to the Treasurer's Office. The Treasurer then

---

5. Although Bollinger's failure to testify at trial cannot be construed as an inference of guilt, it may properly be noted to dispel the erroneous implication in the dissenting opinion that he did testify. See op. at 129.

issued checks to William Mitchell in the amounts of $745 and $1,125. The checks, which were introduced into evidence, carried the endorsements of William Mitchell and Clair Bollinger. However, Mitchell testified that he did not submit the bills, did not do the work indicated on the bills, did not receive the checks, and did not give Bollinger permission to sign checks for him. A stipulation was agreed to by counsel that Bollinger endorsed both his and Mitchell's names on the checks, and then had them deposited in his personal checking account.

The dissent maintains that this evidence was insufficient to convict Bollinger of forgery because Mitchell stated that he was sometimes paid for work he did at the Memorial Stadium Complex by Bollinger out of Bollinger's personal checking account. More specifically, Mitchell stated that he would receive $200 or better from Bollinger in small checks "over a period of time," N.T. at 286, and Bollinger's attorney introduced two checks dated in August 1971 that were payable to Mitchell on Bollinger's personal checking account.[6] However, the total of these checks was only $110, or $1,760 less than the amount Bollinger received from the City in Mitchell's name. Furthermore, it was not entirely clear that these small amounts Bollinger paid Mitchell were for services rendered to the City rather than to Bollinger personally.[7]

6. Although Mitchell denied ever receiving these checks, or that the checks were endorsed by either him or his wife, the Commonwealth stipulated that if officers of the Drovers and Mechanics Bank were called, they would testify that these checks were either deposited or cashed by Mitchell's wife.

Bollinger's attorney also introduced three other checks payable to Mitchell on Bollinger's personal account that were written between September and November 1971. The amounts of these checks do not appear in the trial transcript, and the exhibits have not been transmitted to us on this appeal. However, the amounts of these checks also appear to have been small.

7. Mitchell testified that at least some of the payments he received from Bollinger were for services rendered at a concession stand at the Memorial Stadium Complex. This stand was leased by the City for a percentage of the proceeds to a private concessionaire, who in turn employed Bollinger to assist in running the stand. There was no evidence that the City was ever directly involved in the operation of

Again, this evidence was sufficient to convict Bollinger of forgery.

### New Trial

■ Bollinger's arguments for a new trial may be disposed of summarily. Three of his four arguments allege that Bollinger's co-defendant, Donald Schlosser, was prejudiced by rulings of the lower court. He does not allege, however, that he was prejudiced by the rulings, and thus the arguments must be rejected.[8] The remaining argument attacks the lower court's jury charge. Bollinger alleges that the charge unduly emphasized the Commonwealth's theory of prosecution, but nowhere does he cite specific instances where this occurred. Nevertheless, we have read the court's entire charge, and conclude that this claim is frivolous.

■ Even though we find the evidence sufficient to sustain Bollinger's conviction for forgery, and grounds for a new trial do not exist, we nevertheless must vacate the sentence imposed upon this conviction and remand for resentencing. Bollinger's convictions of larceny by employee, theft by failure to make required disposition of funds, and misbehavior in office may have influenced the sentence imposed by the court on the forgery conviction. "[W]here one of two or more convictions has been held invalid . . . [and the invalid conviction] 'may have influenced the sentence becomes apparent on an appeal, . . . the proper course is usually to vacate the sentences and remand for

the stand or that it was obliged to provide personnel to operate it, although Mitchell did testify that he sometimes worked in the stand on City time until he was told in 1974 by a City official that he should stay out of it. Thus, it appears that part of Bollinger's payments to Mitchell were on behalf of the concessionaire, not the City.

8. Bollinger argues that the lower court abused its discretion by granting the Commonwealth's motion to consolidate the trials because most of the evidence presented at trial was against him and not Schlosser. Bollinger also argues that the lower court erroneously admitted evidence that was inadmissible against Schlosser; there is no question however, that this evidence was admissible against Bollinger. Finally, Bollinger argues that because the lower court dismissed at trial five of the seven charges against Schlosser, it should have ordered a new trial.

resentencing on the valid counts without consideration of the invalid one.' " *Commonwealth v. Grant*, 235 Pa.Super. 357, 365–66, 341 A.2d 511, 515 (1975), *quoting Commonwealth v. Lockhart*, 223 Pa.Super. 60, 65, 296 A.2d 883, 886 (1972).

## II.

The Commonwealth appeal [9] alleges that the lower court erred by 1) not ordering Bollinger to make restitution, and 2) not taxing the costs of prosecution to Bollinger.

■ Because the Commonwealth, in most instances, cannot appeal from the judgment of sentence imposed on a defendant, *Commonwealth v. Marks*, 442 Pa. 208, 275 A.2d 81 (1971); *Commonwealth v. Wrona*, 442 Pa. 201, 275 A.2d 78 (1971), we have grave doubts concerning the Commonwealth's right to question the propriety of the lower court's refusal to order restitution.[10] In any case, in arguing that the lower court erred by not ordering restitution, the Commonwealth relies on a statutory provision that was repealed forty years ago. *See* 19 P.S. § 981 (1964), *repealed in part by* the Penal Code, Act of June 24, 1939, P.L. 872, § 1201, 18 P.S. § 5201 (1963); *see also Commonwealth v. Flashburg*, 237 Pa.Super. 424, 352 A.2d 185 (1975); *Commonwealth v. Gross*, 161 Pa.Super. 613, 56 A.2d 303 (1948). At the time Bollinger committed the forgeries,[11] the Penal Code gave sentencing

**9.** As noted above, the Commonwealth has filed two appeals, one of which challenges the lower court's refusal to impose costs upon Schlosser, or to order Schlosser to make restitution. Since this court has concluded that the evidence was insufficient to sustain any of Schlosser's convictions, the lower court did not have the power to enter such orders.

**10.** It may be noted that the Commonwealth's right to appeal in future cases attacking a sentence on the ground that the sentencing court abused its discretion will be greatly expanded once the Pennsylvania Sentencing Commission promulgates sentencing guidelines. *See* Act of Nov. 26, 1978, P.L. 1316, No. 319, § 3, 18 Pa.C.S.A. § 1386 (Supp. 1979–80) (eff. Jan. 1, 1979).

**11.** Although Bollinger was not sentenced until after the effective date of the Crimes Code, it has been held that for crimes committed under the old Penal Code, the sentencing provisions of the Penal Code

courts discretion in deciding whether or not to order restitution. *See* 18 P.S. § 5109 (1973–74 Supp.), *repealed by* the Crimes Code, Act of Dec. 6, 1972, P.L. 1482, No. 334, § 5, 18 Pa.C.S.A. (1973).[12] The Commonwealth has not demonstrated that the lower court committed any sentencing abuse.

The above problems do not surround the Commonwealth's appeal from the lower court's order refusing to tax the costs of prosecution to Bollinger. The taxation of costs in a criminal prosecution does not form a part of the penalty imposed by the statute providing for the punishment of the criminal offense. *Commonwealth v. Soudani*, 193 Pa.Super. 353, 165 A.2d 709 (1960); *Commonwealth v. Dunleavy*, 16 Pa.Super. 380 (1901). Rather, taxation of costs is an incident of the judgment, *Commonwealth v. Denson*, 157 Pa.Super. 257, 40 A.2d 895 (1945), and a person upon whom costs are taxed has the right to appeal from the taxation order. *Commonwealth v. Charters*, 20 Pa.Super. 599 (1902). In the present case, the lower court has imposed the costs of prosecution upon the county, and thus the county has the right to appeal.[13]

It is established that a person convicted of a crime is liable for the costs necessarily incurred in the prosecution. *See Commonwealth v. Davy*, 456 Pa. 88, 317 A.2d 48 (1974); *Commonwealth v. Smith*, 239 Pa.Super. 440, 361 A.2d 881 (1976); *Upsey v. Secretary of Revenue*, 193 Pa.Super. 466, 165 A.2d 267 (1960); *Commonwealth v. Garramone*, 115 Pa.Super. 588, 176 A. 263 (1935); *Commonwealth v. Evans*,

apply, no matter if the defendant is not sentenced until after its repeal. *Commonwealth v. Stouffer*, 241 Pa.Super. 142, 359 A.2d 829 (1976).

**12.** 18 Pa.C.S.A. §§ 1106(a), 1321(c) (Supp. 1979–80) are the current provisions permitting a court to order the perpetrator of the crime to make restitution to the victim.

**13.** Bollinger has not asserted that the district attorney is without standing to represent the interests of the county on this appeal, and we have not considered the issue. *But cf. Commonwealth v. Trunk*, 320 Pa. 270, 182 A. 540 (1936) (in a criminal prosecution the district attorney represents the interests of the county as well as the interests of the Commonwealth).

59 Pa.Super. 607 (1915); 19 P.S. § 1223 (1964), *repealed by* the Judiciary Act Repealer Act, Act of April 28, 1978, P.L. 202, No. 53, § 2(a) [377], 42 Pa.C.S.A. § 20002(a)(2) [377] (1979 Pamphlet) (effective June 27, 1979). Thus, Bollinger is liable for the costs necessarily incurred in prosecuting him for forgery.[14] The Commonwealth claims that these costs include $11,095.10 for the fees of an accountant retained by the district attorney to examine and audit the Memorial Stadium Fund, and an additional $1,182.19 for other prosecution expenses. However, the lower court found that the accountant's services were of minimal value to the Commonwealth's prosecution of Bollinger. Slip op. of the lower court at 2–3. A review of the record supports this assessment. The accountant's testimony at trial had little bearing on any of the charges against Bollinger, and no relevance to the forgery charges. In addition, nothing in the record indicates that the accountant's pre-trial investigations uncovered evidence that permitted the Commonwealth to secure the forgery convictions. Since Bollinger is liable for the accountant's fees only if they were necessarily incurred to secure his convictions, *Commonwealth v. Hower*, 267 Pa.Super. 182, 406 A.2d 754 (1979); 16 P.S. § 1403 (1956), and since it was the Commonwealth's burden to show that the fees were necessarily incurred, *Commonwealth v. Coder*, 252 Pa.Super. 508, 522, 382 A.2d 131, 138–139 (1977) (CER-CONE, J., dissenting), Bollinger is not liable for them.

The record, however, is inadequate for us to determine Bollinger's liability for the remaining costs claimed by the Commonwealth. It seems clear that Bollinger is liable for some of the costs. However, the bill of costs submitted by the Commonwealth to the lower court does not disclose the nature of the largest expense ($767.99) included in the bill. Furthermore, the bill appears to include extraordinary transportation expenses that were unnecessary to Bollinger's prosecution. *See* Slip op. of the lower court at 3–4.

14. Bollinger, however, is not liable for the costs of prosecution on any of the charges on which he was not convicted, or on the convictions that we reverse today. *Commonwealth v. Smith, supra*; *Commonwealth v. Soudani, supra*.

The lower court refused to impose any costs on Bollinger, in part because of the difficulties in allocating to Bollinger his proper share of the costs. The court did, however, find Bollinger $3,000 with the understanding that the fine would be for "the use of the county, as a penalty, which would reimburse the county in part for the expenses of this prosecution . . . ." Slip op. of the lower court at 4. We need not decide now whether a court may properly refuse to impose costs on a convicted defendant when it fines the defendant in any amount exceeding the costs of prosecution, and also directs that the fine is for the use of the county. For the reasons already stated, we must vacate the judgment of sentence imposed on Bollinger, including the $3,000 fine. Thus, at this time, no order exists protecting the county's right to reimbursement from Bollinger for the costs of his prosecution. Given this circumstance, we believe that the lower court's order refusing to impose costs on Bollinger must be vacated. On remand the lower court should consider the issue of costs separately from the issue of what fine, if any, should be imposed upon Bollinger.

Donald Schlosser's convictions are reversed and he is discharged; Clair Bollinger's convictions of larceny by employee, theft by failure to make required disposition of funds, and misbehavior in office are reversed. His conviction for forgery is sustained, and the judgment of sentence imposed on the forgery conviction is vacated and the case remanded for resentencing. The lower court's order refusing to tax the costs of prosecution against Donald Schlosser, or to order him to make restitution is affirmed. The lower court's order refusing to tax the costs of prosecution against Clair Bollinger is reversed.

PRICE, J., files a dissenting opinion in which VAN der VOORT, J., joins.

JACOBS, former President Judge, did not participate in the consideration or decision in this case.

PRICE, Judge, dissenting:

The instant proceeding is a combination of four separate appeals. The defendants appeal at numbers 374 and 375 alleging errors in their convictions for various offenses, and the Commonwealth appeals at numbers 363 and 364 challenging the action of the court below for failing to include as part of the sentences a requirement that the defendants pay the costs of prosecution andmake restitution. For the reasons stated herein, we would reverse the judgment of the lower court as to all convictions under appeals numbered 374 and 375.

Defendant Clair Bollinger was convicted under The Penal Code [1] of forgery [2] and larceny by an employee; [3] under the Crimes Code of theft by failure to make required disposition of funds; [4] and of the common law offense of misbehavior in office. Donald Schlosser was convicted of larceny by an employee and misbehavior in office. The facts of their offenses involve a very complicated series of transactions in York. Although most of the evidence centered around the activities of Bollinger, Schlosser was convicted for aiding and abetting in the transactions as Bollinger's supervisor.

The facts of these transactions are as follows. From 1970 to 1974, Schlosser served as the Director of Community Development for the City of York. In his role as Director, he hired Bollinger as the Supervisor of Memorial Stadium, a complex of approximately five or six softball and baseball fields owned by the City of York. Prior to 1970, the Supervisor of Memorial Stadium was little more than a groundskeeper. At some unspecified date, a professional baseball team in York cancelled its lease, thus resulting in little or no rental income accruing from the stadium. Upon assuming his office, Bollinger undertook to entice more

1. Act of June 24, 1939, P.L. 872, §§ 101 *et seq.*, 18 P.S. §§ 4101 *et seq., repealed*, Act of Dec. 6, 1972, P.L. 1482, § 5.

2. *Id.* at § 1014, 18 P.S. § 5014.

3. *Id.* at § 815, 18 P.S. § 4815.

4. 18 Pa.C.S. § 3927.

organizations to utilize the complex. Additionally, Bollinger worked as a promoter for various softball associations, and was also paid $2,500 per year by a local corporation, York Barbell Company, to promote greater interest in the game of softball.

From 1971 to 1973 Bollinger bid for and received the right to host a national softball tournament in the City of York. This was done in his capacity as a private softball promoter, and not in his official role as the supervisor of Memorial Stadium. To host the tournament, it was necessary to prepare the softball fields according to specifications promulgated by the sponsoring Amateur Softball Association (ASA). Because the City of York was unwilling to underwrite the expense of a study to determine the cost of preparing the fields, Bollinger entered into an agreement with the manager of employee relations for American Machine and Foundary (AMF) to borrow $1,450 from a local bank to pay for the study. AMF had its own softball team and was interested in serving as host team for the 1971 tournament. The survey was prepared by a local engineering firm and estimated that it would cost approximately $56,000 to prepare the fields to meet the ASA specifications. Bollinger allegedly stated that the AMF team would not be required to pay for the use of the fields as reimbursement for helping fund the engineering study.

On March 3, 1972, Bollinger opened a private bank account entitled "Memorial Stadium Fund." He and Schlosser were the only parties authorized to withdraw funds, although evidence established that only Bollinger actually disbursed money from the account.

Funds flowed into the account from three major sources. Bollinger assessed a fee of $60 to each team that joined a softball league which made use of the field at Memorial Stadium. The breakdown of this fee was as follows: $25 for the use of the facilities, lights, and general maintenance; $8 for the ASA; $10 to the United States Slow Pitch Softball Association (testimony indicated that this fee was subsequently refunded to each team); and the remainder to

Bollinger, which he allegedly used to buy trophies for the tournaments and to defray personal expenses associated with promoting softball. Schlosser sent a letter in his capacity as Director of Community Development to each of the teams instructing them to make the $60 payable to Bollinger, as Supervisor of Memorial Stadium. Fees were also charged to various organizations that wanted to use the facilities, but were not members of an established softball or baseball league. Finally, money was donated by local corporations interested in seeing the complex rebuilt. York Barbell Company, for example, donated $10,200 for construction of new restroom facilities.

Bollinger then set out to rebuild the facilities by installing new fences, new restroom facilities, a press box, and by general maintenance. This rebuilding was accomplished through various means. First, city maintenance employees were utilized during their working hours. Second, two city employees were also employed during their free time and were paid by check or in cash out of a fund maintained by the Clair L. Bollinger Agency, Incorporated. Third, a small private contractor was employed and was also paid by the Bollinger Agency. In the case of the moonlighting employees and the contractor, Bollinger submitted fictitious bills in their names to the city. Schlosser approved the bills, and a total of four checks were issued, with one of the employees to receive two checks and the other employee and contractor to receive one each. At Schlosser's direction, however, the checks were not mailed to the payees, but instead were given directly to Bollinger. Bollinger forged the payees' names on the checks, cashed them, and in three instances deposited the money in the Bollinger Agency account. In the other instance, the money was deposited in the Memorial Stadium Fund account. The employees and the contractor testified that they were actually paid less than the amount of the check, and that in certain situations they did not do all of the work listed on the fictitious bill, although they were paid in cash or from the Bollinger Agency account for work not listed on the bill. The contractor also testified

that because his credit rating was poor, Bollinger bought and paid for the fence that the contractor erected, as well as paid the wages of some of his workers who aided in erecting the fence. Bollinger claimed that the excess he received from cashing the checks was reimbursement for the raw materials and additional wages.

Construction was also achieved in another way. Bollinger hired three individuals to perform work on the fields, and instructed the treasurer of York Barbell Company to issue checks to the three individuals for work they had allegedly performed. One of the individuals, Barry Altland, was called to testify. He stated that he was employed and paid by the City of York to help construct the press box at Memorial Stadium. In his off-hours, he was hired by Bollinger to erect a fence at one of the fields, and he worked in the concession stands during softball games. He subsequently received a check from York Barbell in the amount of $1,385, indicating payment for constructing the press box. He contacted Bollinger and was informed that it was a mistake, that the payment was for erecting the fence, but that the check included his labor plus the cost of the fence. Altland signed the check and gave it to Bollinger, who apparently deposited it in the Bollinger Agency account. Altland further testified that while working on the press box, Bollinger personally supplied some of the materials for its construction. The other two individuals who were paid by York Barbell at Bollinger's direction did not testify.

In 1974 a new mayor assumed office for the City of York, and Schlosser was replaced as Director of Community Development. The new mayor met with Bollinger in March of 1974 and requested, first, that the name of the Memorial Stadium Fund be changed as it might be misleading and could be construed as an official account under the control of the city. He testified that the fund was not a city account and that the city was not entitled to all of the money in the account. He also requested payment to the city of the $25 fee that had been charged to each team in a softball league. Payment was requested pursuant to a York ordinance which stated,

"The mayor of the City of York is hereby authorized and empowered to negotiate leases of the Memorial Stadium in Spring Garden Memorial Park in the City of York, Pennsylvania, upon such terms as he may prescribe, for short terms. Said leases shall be signed by the Mayor and the City Controller. *All fees received for such leases shall be turned over to the City Treasurer.*" (N.T. 21) (emphasis added).

The mayor also instructed the softball teams to henceforth make the $25 payments directly to the city. The mayor testified that shortly thereafter, Bollinger transferred approximately $1,500 to $1,700 from the Memorial Stadium Fund to the city and changed the name of the fund to the York Barbell Softball Fund. In September 1974, Bollinger was replaced as supervisor of Memorial Stadium.

As stated, both Bollinger and Schlosser appeal their convictions. Their primary contention is that the convictions cannot stand absent proof that they profited from their activities. Essentially, their defense is that Bollinger achieved the rebuilding of the stadium more efficiently and for a much lower price than if the work had been performed through regular channels. He achieved this by cutting through the "red tape" and acting as a "contractor" to coordinate the activities of the workers. This was achieved at a substantial savings of the original estimate of $56,000, and without proof that either Bollinger or Schlosser profited from the undertaking or appropriated any funds to their own use. Absent such proof, they claim their convictions cannot be sustained. We will examine this contention in the context of each of the crimes charged.

First, both Bollinger and Schlosser were convicted of larceny by an employee. This crime was a special form of embezzlement under The Penal Code and prior law, and was committed when a third party gave property to an employee with instructions to transfer the property to the employer, and the employee utilized the property for his own benefit. *See Commonwealth v. Diamond,* 79 Pa.Super. 54 (1922); 18 P.S. § 4815, Historical Note. In instructing the jury, the

court below stated that any one of three sets of activities may have established this offense: (1) the co-mingling of the $25 rental fees charged to each baseball team with Bollinger's personal funds in the Memorial Stadium Fund account; (2) the "fictitious bill" transactions whereby Bollinger hired and paid two moonlighting employees and one contractor and then submitted four fictitious bills to the city for their work and forged their signatures to the checks; and (3) the money paid directly to the three individual workers by York Barbell at Bollinger's direction.

With respect to the first transaction, we must conclude that the mere co-mingling of "city" money with private funds in the Memorial Stadium Fund is insufficient to sustain a conviction under this offense, especially since this co-mingling was known and acquiesced to by the York officials. *See Young, Smyth, Field & Co. v. Glendinning*, 194 Pa. 550, 45 A. 364 (1900). Although the indictments charged the defendants with obtaining $23,112 in the name of the account, the evidence at trial failed to establish how much of this fund was expended for improvements at Memorial Stadium, and how much was expended for the personal benefit of Bollinger and Schlosser. Evidence established that Bollinger used money from the fund to pay for certain improvements at his home, paid a $200 debt owed by Schlosser, and funded various trips to softball conventions and tournaments. However, the mayor of York testified that the fund was not a city account and that he could not demand that it be turned over to the City of York in that it contained private funds of Mr. Bollinger. The accountant who testified for the prosecution either failed to, or was unable to state what portion of the fund belonged to the city, or what amounts were spent for improvements at Memorial Stadium or the private expenses of the defendants. Moreover, approximately $1,500 to $1,700 was remitted to the city in 1974 as reimbursement of the $25 fee charged to each softball team. Whether this represented all or only some of the fees actually collected was never established. Accordingly, the mere co-mingling of funds when

such activity was authorized and absent proof that the defendants wrongfully appropriated the money to their own use, was insufficient to establish this offense.

The Commonwealth contends, however, that the city ordinance requiring payment of such fees to the city imposed an obligation of *immediate* transfer. In light of the evidence, we must disagree.

The record establishes that strict adherence to the ordinance was not followed either by Bollinger or the city. Contrary to the ordinance, leases of the stadium were neither in writing nor approved by the mayor or city controller. Thus, while the ordinance may establish the ultimate standard by which Bollinger must account to the city, urgency of payment was not a top priority, and payment was made upon first demand in or around March of 1974.[5] Accordingly, Bollinger's dilatory approach to transferring the funds to the city does not establish this offense absent proof of an actual larceny.

The second set of activities cited by the court below was the "fictitious bill" transactions. Again, we conclude that these activities do not establish the crime of larceny by an employee.

When Bollinger, with Schlosser's assistance, submitted the four fictitious bills to the city and obtained the checks that were intended for the employees and the contractor, he was not receiving this property in his role as a city employee

5. The court below also concluded that Bollinger's payment upon first demand would not exculpate his activity since he had initially acquired the funds through a misrepresentation that the Memorial Stadium Fund was an official city account. *See Commonwealth v. Spiegel*, 169 Pa.Super. 252, 82 A.2d 692 (1951). Again, the record fails to support this conclusion.

None of the witnesses testified that they were misled into assuming that the fund was an official city account. The money was paid to Bollinger under the assumption that it would be used to defray expenses at the park and, in certain cases, to pay membership dues to the various softball associations. Only the mayor of York testified contrary to this, and he stated only that the name of the fund could be misleading. Absent proof of an actual misrepresentation, Bollinger's acceptance and co-mingling of funds with the tacit consent of city officials does not, under the facts stated, establish this offense.

with a concomitant duty to transfer the property to his employer, the City of York. Bollinger's only role as an employee was that it put him in an advantageous position to accomplish the act, but did not impose a duty as an employee to transfer the property to the employer. Accordingly, the defendants' convictions of larceny by an employee cannot be supported under this series of transactions.

For the same reasons, we conclude that this offense was not supported by the transactions whereby Bollinger instructed York Barbell to pay various sums to three workers for their work at Memorial Stadium. Although only one worker testified and indicated that by means of a misrepresentation he transferred the check to Bollinger, the crime of larceny by an employee was not established. When Bollinger obtained the check from Altland, he was under no duty to transfer that fund to either of his employers, the City of York or YorkBarbell Company. Accordingly, there being no evidence to establish the elements of this offense, we would reverse the convictions as to both defendants.

Defendant Bollinger was also charged with violating 18 Pa.C.S. § 3927, theft by failure to make required disposition of funds. This provision is the analogous Crimes Code offense to larceny by an employee and was to encompass events occurring on or after June 6, 1973. The activities covered by this crime were the $10,200 donated by York Barbell Company, three checks from York Catholic Athletic Association in March 1974 for rental of one of the fields, and two checks in 1973 from York College for rental of the stadium. All checks appear to have been deposited in the Memorial Stadium Fund account, except one check from York College which was deposited in the Bollinger Agency account.

Evidence presented failed to establish whether Bollinger paid the funds as designated. The $10,200 from York Barbell was donated directly to the Memorial Stadium Fund for use in constructing restroom facilities and was not intended as a gift to the City of York to help defray general revenue expenses. The restroom facilities were built to the satisfac-

tion of the company, and no evidence was presented to indicate whether the actual cost was more or less than $10,200. In the same light, testimony failed to establish whether the rental payments made by the York Catholic Association and York College were included in the $1,500 to $1,700 payment to the city in or around March of 1974. In *Commonwealth v. Crafton*, 240 Pa.Super. 12, 367 A.2d 1092 (1976), we determined that the mere co-mingling of funds was insufficient to establish an offense under 18 Pa.C.S. § 3927. "It is only when the required payments are not made that criminal liability attaches." *Id.* at 18, 367 A.2d at 1095–96. Absent proof that Bollinger failed to properly dispose of the funds, the conviction for theft by failure to make required disposition of funds cannot be sustained.

Bollinger also challenges his conviction on four counts of forgery. The essential elements of this Penal Code offense are: "(1) the false making of some instrument in writing, (2) the instrument must be apparently capable of effecting a fraud and working an injury to another, and (3) there must be a fraudulent intent." *Commonwealth v. DiPiero*, 205 Pa.Super. 312, 317, 208 A.2d 912, 914 (1965), *allocatur refused*, 205 Pa.Super. xxxvii, *cert. denied*, 382 U.S. 992, 86 S.Ct. 574, 15 L.Ed.2d 479 (1966), *quoting Commonwealth v. Powers*, 110 Pa.Super. 319, 323, 168 A. 328, 330 (1933). Bollinger admits falsely affixing the signatures of the employees and the contractor on the four checks issued to them, but claims a lack of evidence establishing a fraudulent intent. Contrary to the majority, we would agree that the evidence is insufficient to establish a fraudulent intent.

In *Commonwealth v. DiPiero, supra*, we held that "[o]ne may indeed sign another's name to a check and falsely make the instrument without any criminality. However, when he does so with the intent to defraud, and another is prejudiced, a forgery has been committed." *Id.* 205 Pa.Super. at 316, 208 A.2d at 914. In *Franklin Fire Ins. Co. v. Bradford*, 201 Pa. 32, 50 A. 286 (1901), the supreme court determined that a forgery had not occurred when a sub-agent falsely affixed the signature of his employer, an authorized insurance agent, to a policy application. Although the signature was

unauthorized, forgery was not established when the sub-agent received the commission and deposited it in his employer's account, and did not appropriate any portion to his own use. The court held that under the above set of facts, "Evidence of the fraudulent intent is here almost wholly lacking. . . . [The sub-agent] appropriated not one cent to his own use; nor does the evidence show that he benefited in the remotest degree by the act. There is no evidence indicating a fraudulent intent." *Id.*, 201 Pa. at 35, 50 A. at 287.

In light of the above principles, we would conclude that the Commonwealth failed to establish that Bollinger perpetrated the scheme with an intent to defraud. The testimony only establishes that he paid the employees and the contractor an amount less than that obtained by the city for their services, but they made no claim that they were defrauded of any funds. Moreover, their testimony and the testimony of others supported Bollinger's claim that they were paid for additional work for which Bollinger was not reimbursed by the city, and that he paid for part of the materials used in maintaining the stadium complex. Thus, while an immediate "profit" appears to have been made as to the employees and the contractor, they made no claim of loss, nor do we feel that prejudice on the part of the city could be established absent testimony regarding the bottom line of Bollinger's activities. No evidence was presented to support a finding that he obtained an ultimate profit nor that the operation was conducted with an intent to defraud either the city or the workers. While intent may be proven circumstantially, *see e. g., Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30 (1976), the unauthorized endorsing of the signatures on the checks was, by itself, insufficient to establish the offense of forgery.

The defendants' final transgressions for which they were convicted were the offenses of misbehavior in office. "The common law crime of misconduct in office, variously called misbehavior, misfeasance or misdemeanor in office, means either the breach of a positive statutory duty or the performance by a public official of a discretionary act with an

improper or corrupt motive." *Commonwealth v. Green*, 205 Pa.Super. 539, 546, 211 A.2d 5, 9 (1965). The court below instructed that this crime may have been perpetrated when Bollinger established the private account with a misleading name, co-mingled public and private funds, co-mingled his tasks as an employee of the city and as softball promoter, established his "contracting" operation, and offered to permit the AMF softball team to play free of charge if it would held defray the $1,450 expense for the survey of the park. Schlosser could be convicted of this offense, the court instructed, by accepting money, drawn from the Memorial Stadium Fund account, from Bollinger and instructing his secretary not to mail the checks to the two workers and the contractor, but instead to give their checks directly to Bollinger. Again, we must conclude that the evidence presented is fatally deficient to establish that these activities were performed with an improper or corrupt motive.

Bollinger's activities in establishing the account and co-mingling funds and functions were well known and, at least until 1974, tacitly approved by the York officials. His "contracting" operation was readily acknowledged as an efficient method for rebuilding and maintaining the Memorial Stadium complex and resulted in considerable savings of the original $56,000 estimate to rehabilitate the facilities. Evidence failed to establish whether Bollinger profited from this operation, and the only evidence was that he once received one-fourth of $398.97 as his profit from one of the softball tournaments; this profit was proper, in that Bollinger "owned" the rights to the tournament, having been awarded the rights by the Amateur Softball Association. No evidence was presented as to whether the AMF team was assessed a fee for its use of the fields or whether its use was reflected in the $1,500 to $1,700 paid to the city in 1974. Moreover, the mere withdrawal of funds from the Memorial Stadium Fund account by Bollinger and Schlosser would not establish misbehavior in office since it was not established whether the money withdrawn for private use was "city" money, or the private funds of the defendants. Finally, the use of their public offices to obtain the checks earmarked for

140

the two employees and the contractor was not established to be motivated by improper or corrupt purposes. Their claimed defense of wishing to re-coup their expenses and prevent double payment to the workers was supported by the testimony of the workers and was not refuted by the Commonwealth's evidence.

Although jurors are entrusted with the task of resolving factual disputes and questions of credibility, *see, e. g., Commonwealth v. Boyle*, 470 Pa. 343, 368 A.2d 661 (1977); *Commonwealth v. Kahley*, 467 Pa. 272, 356 A.2d 745 (1976), *cert. denied*, 429 U.S. 1044, 97 S.Ct. 746, 50 L.Ed.2d 757 (1977), their decisions may not be based upon surmise or conjecture. *See e. g., Commonwealth v. Thomas*, 465 Pa. 442, 350 A.2d 847 (1976); *Commonwealth v. Eddington*, 255 Pa.Super. 25, 386 A.2d 117 (1978). Given the paucity of evidence regarding the financial dealings of the defendants and the flow of funds in the Memorial Stadium Fund, we would conclude that the evidence was insufficient to permit a jury to conclude that the defendants conducted their operation with the type of criminal intent required for all of the offenses charged.

Accordingly, we would reverse the convictions on all counts and order the defendants discharged.

VAN der VOORT, J., joins in this opinion.